JOHN T. MCDONALD, APPELLEE, V. JOHN A. BUCKSTAFF, APPELLANT, IMPLEADED WITH WILLIAM H. B. STOUT ET AL.

FILED SEPTEMBER 23, 1898.   No. 8091.

1. **Transcript for Review:** RIGHTS OF CROSS-APPELLANT.  One party having perfected an appeal by filing a transcript in this court, the other may maintain a cross-appeal on the same transcript.  It is unnecessary for him to file a duplicate.

2. **Partnership:** PAVING CONTRACT: PROFITS: ACCOUNTING.  S. & B., having formed a partnership for the purpose of paving streets, contracted with M. that the latter should superintend the work and receive as his compensation twenty-five per cent of the net profits.  *Held*, That in an accounting M. was restricted to the profits actually earned except as they might be reduced by acts of bad faith on the part of S. & B.

3. ———: ———: ———: ———: SALARY.  The contract between S. & B. provided that B. should have charge of the business of the firm and that he should receive a stated salary for his services in that behalf.  *Held*, That in calculating the profits to ascertain M.'s share, this salary should be treated as an expense, although while the work was in progress B. had acquired S.'s interest.

4. ———: ———: ———: ———.  B. was also the owner of a brick manufactory which furnished most of the brick with which the paving was done.  He borrowed money on the credit of the paving concern and lent it to the brick concern without interest. *Held*, That as between B. and M. the interest paid on the loans was a charge against the brick concern, and could not be charged against the paving concern as an expense thereof.

5. ———: ———: ACCOUNTING: BOOKS OF ACCOUNT: EVIDENCE.  M.'s contract providing that he should have access to the books of S. & B., and M., having constantly availed himself of the right, those books are in an accounting competent evidence on behalf of either party.

6. ———: ———: ———: LOBBYING EXPENSES: PUBLIC POLICY.  The

payment of money by a public contractor to induce men to remain silent, or to lobby on behalf of contracts or estimates, is against public policy, and the courts will not compel contribution between partners on account thereof, nor will they, when one partner is chargeable with the receipts, allow him credit for money so expended.

APPEAL from the district court of Lancaster county. Heard below before HASTINGS, J. *Modified.*

The issues and facts are stated in the opinion.

*Charles O. Whedon,* for appellant:

The appellee having had access to the books, they were *prima facie* evidence against him. (*Topliff v. Jackson,* 12 Gray [Mass.] 565; *Caldwell v. Leiber,* 7 Paige Ch. [N. Y.] 483.)

Plaintiff ascertained from the books that defendant was drawing a salary, and having failed to object, he is in no position to make objection after completion of the work. (2 Herman, Estoppel 1165, 1172; *Grant v. Cropsey,* 8 Neb. 205; *Newman v. Mueller,* 16 Neb. 523; *Betts v. Sims,* 25 Neb. 166; *St. Louis Wrought Iron Range Co. v. Meyer,* 31 Neb. 551; *Cain v. Boller,* 41 Neb. 721; *Winchester v. Glazier,* 152 Mass. 316.)

The refusal of the referee to allow defendant's charges for interest was erroneous. (*Duden v. Maloy,* 11 U. S. C. C. A. 119; *Helmer v. Yetzer,* 61 N. W. Rep. [Ia.] 206.)

Reference as to defendant's charges for lobbying expenses: *Johnson v. Byerly,* 3 Head [Tenn.] 194.

*Joseph R. Webster, Halleck F. Rose,* and *Cyrus W. Fisherdick, contra:*

Salary is not allowable to a partner for service in the partnership business, except upon an express agreement. (*Denver v. Roane,* 99 U. S. 358; *Caldwell v. Lieber,* 7 Paige Ch. [N. Y.] 483; *Godfrey v. White,* 43 Mich. 183; 2 Bates, Law of Partnership sec. 770.)

Defendant's interest account was properly disallowed. (*Van Ness v. Van Ness,* 32 N. J. Eq. 729; *Johnson v. Garrett,*

23 Minn. 566; *Dimond v. Henderson,* 47 Wis. 172; *Harvey v. Varney,* 104 Mass. 436; *Gray v. Haig,* 20 Beav. [Eng.] 238; *Simpson v. Feltz,* 16 Am. Dec. [S. Car.] 602; *Catron v. Shepherd,* 8 Neb. 308; *Shaler v. Trowbridge,* 28 N. J. Eq. 595; *Rogers v. Batchelor,* 12 Pet. [U. S.] 230.)

Defendant's charges for lobbying expenses are not allowable. Payment of money for lobbying is against public policy. Contracts which are void as being against public policy cannot be ratified. (Greenhood, Public Policy p. 8; *Shenk v. Phelps,* 6 Brad. [Ill.] 612; *Coppell v. Hall,* 7 Wall. [U. S.] 538; *Thompson v. Warren,* 8 B. Mon. [Ky.] 491; *Wheeler v. Wheeler,* 5 Lans. [N. Y.] 355; *Hunter v. Nolf,* 71 Pa. St. 382; *McKee v. Cheney,* 52 How. Pr. [N. Y.] 144; *Pearsoll v. Chapin,* 44 Pa. St. 9; *Robinson v. Kalbfleisch,* 5 T. & C. [N. Y.] 212; *Firemen's Charitable Ass'n v. Berghaus,* 13 La. Ann. 209; *Negley v. Lindsay,* 67 Pa. St. 217; *Sampson v. Shaw,* 101 Mass. 145; *Holman v. Jornson,* 1 Cowp. [Eng.] 343; *El Dorado County v. Davidson,* 30 Cal. 524; *Crawford v. Wick,* 18 O. St. 190; *Oscanyan v. Arms Co.,* 103 U. S. 261; *Lucas v. Allen,* 80 Ky. 611.)

Irvine, C.

This was an action by McDonald against Buckstaff, the object of which was to secure an accounting of certain transactions growing out of the paving of streets in the city of Lincoln. The case resulted in a judgment in the district court against Buckstaff for $4,392.72. Buckstaff perfected an appeal to this court, and on the same transcript McDonald caused a notice of appeal to be issued and served. Buckstaff now objects to the consideration of the case in the light of an appeal by McDonald on the ground that Buckstaff alone provided and filed the transcript. The filing of a duplicate transcript would be an idle procedure, and the uniform practice of the court, which is certainly not opposed to statute, has been to consider a cross-appeal based on the appellant's transcript. This practice will here be followed.

Early in 1888 the city of Lincoln awarded to Buckstaff

and W. H. B. Stout contracts for paving certain paving districts, and for the purpose of carrying out said contracts Stout and Buckstaff entered into a partnership contract dated May 4, 1888, which, omitting formal parts, was as follows: "That the said parties have become partners in the business of paving certain streets in the city of Lincoln, Neb., under contracts heretofore awarded them by the proper authorities of said city, said contracts being for paving in districts numbers 3, 4, 5, 6, 7, 8. Said partnership is limited to said business of paving said districts under said contracts and does not extend to any other business. Said partnership is to continue until said work is completed.

"Each party is to furnish and pay in one-half the cash required to carry on said business as the same is needed.

"Books are to be kept which shall contain correct entries of all matters relating to said partnership business; said books shall contain nothing save what relates to said partnership business. Buckstaff shall have the general management and control of said business; he shall pay out all the money on account of said firm, and he alone shall draw and sign drafts, checks, and orders for money on said firm account. For his compensation for managing said business Buckstaff shall receive from said firm the sum of $200 per month.

"Each party is to bear one-half the expense of said business, each party to bear one-half the loss of said business, and each party to receive one-half the profits of said business. In the purchase of material for use in said work, both parties shall be consulted, and they shall agree upon the material and the price to be paid therefor before the same is purchased. Neither of said parties shall draw or take out of the firm account any money until the said work is fully completed."

Shortly afterwards the following contract was made between Stout & Buckstaff on the one side and the plaintiff McDonald on the other: "This agreement made this 17th day of May, A. D. 1888, by and between the firm of

Stout & Buckstaff and John T. McDonald, all of the city of Lincoln, county of Lancaster, and state of Nebraska, witnesseth, as follows:  Said John T. McDonald is employed by the said Stout & Buckstaff as superintendent of the work of paving streets in the said city of Lincoln under contracts heretofore awarded them by the city. Said John T. McDonald is to have the employment of all men, and the discharging of the same employed on the work.  And also the subletting of all contract work, subject to the approval of said Stout & Buckstaff.  In consideration of the services of the said John T. McDonald he is to receive as his compensation twenty-five (25) per cent of the net profit of said work, after deducting all cost and expense of said work, and said John T. McDonald is permitted to draw a sum of money not to exceed two hundred dollars ($200) per month from May 1, A. D. 1888, monthly from said Stout & Buckstaff, which amount shall be deducted from said (25) twenty-five per cent of the net profit going to him.  In case of the death of the said McDonald before the work is completed his legal representatives shall be entitled to receive said twenty-five per cent of the net profits, which said McDonald would be entitled to receive if alive, less any sums he may have drawn; provided his legal representatives shall furnish a competent man to take the place of the said McDonald as superintendent, said John T. McDonald to devote his entire time and attention to said work and the prosecution thereof.  The books and papers of said firm of Stout & Buckstaff relating to said contracts are to be open to the inspection of said McDonald.  Said McDonald is to have no control over the bookkeeper of said Stout & Buckstaff, and no power to discharge the same."

While the work was progressing Buckstaff purchased Stout's interest, so when it came to the settlement, McDonald and Buckstaff were the only interested parties.

The controversy relates to a number of different items or transactions growing out of the business performed,

and relates almost entirely to questions of fact; so much so that the encumbering of the reports with an opinion in the case is justified only by the statute requiring such opinions to be written and filed. A few general observations with reference to the contracts are pertinent, however, to assist in the elucidation of the particular matters in controversy. While in the district court and here the case has been to a certain extent treated as one of an accounting between partners, it will be seen that the arrangement was not strictly one of partnership as between Buckstaff and McDonald. Stout and Buckstaff had formed a partnership for transacting the business; they then contracted with McDonald that McDonald should superintend the work of paving, and receive as his compensation one-fourth of the profits realized by Stout & Buckstaff. The result of the two contracts was that the firm of Stout & Buckstaff was alone the contracting party with the city, entitled to all benefits, and charged with all the responsibilities of the paving contracts. Buckstaff was the business manager, having control of receipts and disbursements. McDonald was in charge of the actual performance of the work, and had the power to employ and discharge workmen. While he was not a party to the contract between Stout & Buckstaff his compensation depended upon their profits. Their profits depended upon the nature of their contracts with the city, the cost of performing the work, the terms of their own contract, and upon Buckstaff's skill and judgment in the management of the business. These were all elements which McDonald consented to when he consented to measure his own compensation by the profits of Stout & Buckstaff. In this proceeding he cannot hold Buckstaff responsible for the highest degree of skill and business judgment. He may only hold him responsible for the actual profits, always with the reservation that good faith must be exercised; that is to say, that if the profits of Stout & Buckstaff were less than they should have been, and the decrease was due merely to mistaken judg-

ment on the part of Buckstaff, McDonald must abide the consequences; but he may hold Buckstaff responsible for any loss of receipts or increased expenditures due to bad faith on Buckstaff's part.

Taking up in the first place Buckstaff's appeal, the first matter in controversy arises out of the disallowance of charges to the amount of $8,800 on account of salary of Buckstaff as manager of the business. The case was in the district court first heard by a referee under a general order of reference. The referee disallowed this item on the theory that McDonald was not a party to the contract between Stout & Buckstaff, and that as between McDonald & Buckstaff there was no agreement whereby the latter was entitled to a salary. This finding of the referee was approved by the district judge, but as already indicated we think the construction thus put on the contracts was erroneous. The matter of Buckstaff's salary was not a mere matter of book-keeping as between Stout & Buckstaff. It was contemplated that Buckstaff should have entire charge of the business operations, and to compensate him in this behalf it was provided that he should receive from the firm of Stout & Buckstaff a salary of $200 per month. If the partners had contracted to employ a third person for this purpose there could be no doubt that this item would be properly an item of expense, to be deducted from the receipts in ascertaining the profits of the partnership. It is none the less so because this work was entrusted to one of the partners. The purchase by Buckstaff of his partner's interest pending the work did not abrogate this provision. McDonald knew, or had the right to know and might have known, when he agreed to receive a portion of the profits as his compensation, what expenses had been assumed, or were contemplated, which might affect the item of profits. This salary should have been allowed, not because it was a part of McDonald's contract, but because it was an agreed item of expense in the Stout & Buckstaff contract, with reference to which the profits must be ascertained,

and because McDonald agreed to accept as his compensation a portion of these profits.

The referee in the district court disallowed to Buckstaff interest charges appearing on the books to the amount of $15,708.50. These arise in the following manner: It was found that the brick makers near Lincoln were entirely unable to furnish brick to the number and of the quality required for the work, and that to procure such brick from a distance would be so expensive as to materially impair if not destroy the profit which should be realized under the contracts. Accordingly there was organized a, corporation known as the Vitrified Paving & Pressed Brick Company, and this corporation established a plant at Lincoln and furnished nearly all the brick required for the work. Stout and Buckstaff were the principal incorporators, and Buckstaff seems to have acquired Stout's interest. While an effort was made to show that other persons were interested in the brick company that effort was a signal failure, and the evidence entirely supports the finding that the brick company and Buckstaff were substantially identical. This brick company required a large amount of money to establish itself and conduct its operations. From the funds of Stout & Buckstaff, or Buckstaff, arising out of the paving, Buckstaff advanced to the brick company large sums of money. He also borrowed on behalf of the paving concern large sums and advanced these to the brick company. The brick company paid to the paving concern no interest, and Buckstaff sought to charge the paving concern with interest on all money borrowed by it and advanced to the brick company. This charge constituted the item the disallowance of which is now complained of. We think the referee and the district court were quite right in disallowing this item. It is true there is evidence tending to show that McDonald knew of these advances and acquiesced therein. It is also true that the evidence tends to show that the net result of the arrangement was a decided benefit to the paving contractors, as they were

thereby enabled to procure brick much cheaper than they could be procured and shipped in from adjacent markets. Still it must be remembered that the brick company was Buckstaff's individual enterprise; that the borrowing of money on interest and re-loaning it without interest was not a natural or reasonable incident to the business for which Stout & Buckstaff's partnership was organized. Such an interest charge should not, without the clearest proof of an antecedent agreement to that effect, be treated as a proper expense of the paving work. It was an expense of the brick company, not of the paving concern.

The referee finds that while the work was in progress McDonald took men engaged thereon and, during time for which they were paid by Buckstaff, used them in the building of a house for McDonald. He did not, however, in the accounting charge McDonald with any amount because thereof, but, in the report, disposed of this in connection with several other items "as afterthoughts sprouting out of the warmth and fertility of this hotbed of litigation after it commenced." We are convinced that this disposition of these minor matters was entirely justified by the proof. It appears that the paving work frequently suffered delays for want of material wherewith to proceed, and considerable laxity was evidently indulged during these periods. The amount of labor thus diverted by McDonald does not appear to any degree of certainty from the evidence, but it does appear that McDonald made some payments to these men himself, and that certain charges for their time were made against him on the books. We cannot say that these charges did not cover the whole item of labor so diverted; or, if they did not, that Buckstaff suffered any damage by reason thereof.

By recurrence to McDonald's contract it will be seen that he agreed to devote his whole time to the work. While that work was in progress McDonald, in connection with O. P. Mason, entered into a contract with the city to pave certain other districts, and from this con-

tract he realized a profit of $4,000. Buckstaff asks that he be charged with three-fourths of this profit as being the result of services to which Buckstaff was entitled. The referee disallowed this item, and, we think, correctly. In the first place there is evidence, contradicted, it is true, but tending to show that Buckstaff was consulted by Mason before he entered into the contract with McDonald, and that Buckstaff consented to McDonald's engaging therein. Even if he did not it is clear that he knew of McDonald's action in that respect while the work was going on, and that he not only made no protest, but that supplies were interchanged, and in that way the work of Mason & McDonald actually assisted. The work does not seem to have been in any sense competitive, and it is not shown that Buckstaff suffered any damage by reason of McDonald's engaging therein. We know of no rule whereby, for such a breach of contract, Buckstaff would be entitled to participate in the profits of the outside work, at least without proof that his own business was thereby affected.

McDonald employed, as foreman on the work, one Christopher. Buckstaff claimed that Christopher spent his time drinking and gambling and neglected the work. He demanded his discharge. McDonald refused to discharge him, and Buckstaff refused thereafter to pay him his wages. Christopher brought suit against Buckstaff and recovered judgment for his wages. The referee and district court charged the total costs of this suit to Buckstaff personally. This item amounted to $78.80. We shall not disturb this finding. McDonald's contract gave him the right to employ and discharge all men except the book-keeper. Under proper allegations and proof Buckstaff might recover for the willful retention of incompetent men, but under the contract Buckstaff had no right to discharge them. When McDonald refused to discharge Christopher his wages were a proper charge against the paving contract. It was Buckstaff's duty to pay them. The judgment determined that they were earned. The

costs incurred under the circumstances were not a proper charge as affecting McDonald, but should be borne by Buckstaff alone.

The bid of Stout & Buckstaff for the paving seems to have been at the rate of $1.75½ per yard, but for some reason the contract was executed at the rate of $1.75 per yard. A portion of the paving was settled for at a rate of $1.75½, but the discrepancy between the bid and the contract having been discovered the city allowed for the remainder only $1.75—the contract rate. Buckstaff presented a claim to the council for the additional half cent per yard. It was disallowed, and the proceedings stopped. Buckstaff sought to charge McDonald with the amount so lost, on the theory that McDonald had interfered and prevented the allowance of the claim. This charge was properly denied. If there was a mistake in the contract, Buckstaff had his remedy by appropriate legal proceedings against the city for its reformation. If the mistake was not of such character that it might be so reformed then no legal damage resulted.

Complaint is made in the briefs that McDonald was not charged with sufficient cash. In his petition he admitted receiving $8,663.41, and it is said that the referee charged him only with $8,292.29; but an inspection of the report will show that there are charges made of moneys received outside of the item of $8,292.29, which came directly from the paving contracts, more than sufficient to meet the admission of receipts in the petition. In this connection it is also argued that McDonald should be charged interest on certain loans of money made by Buckstaff. An examination of the evidence in this behalf entirely justifies the conclusion which seems to have been made by the referee—that these loans were treated as advances on account of the work and carried into McDonald's account. This is true except with regard to a note for $125 made August 1, 1889, due in one year, and stipulated to bear ten per cent interest after maturity. This was an express contract to pay interest and was probably overlooked by

the referee. It was, however, brought into the accounting by Buckstaff himself. He should be allowed interest thereon from the maturity of the note to December 31, 1891—the date at which the referee computed the balance of the account. Thenceforth it became merged in the account. This item makes an additional charge against McDonald of $17.70.

On McDonald's appeal the principal controversy is as to the expenses incurred for brick used in the paving. The books show an expense for brick of a little over $250,-000. The referee first proceeded by deducting from this $6,483.29 on account of certain brick furnished by the Vitrified Paving & Pressed Brick Company, and charged at the rate of $11 per thousand instead of $10, the contract rate. He then made a computation of the number of brick used in the paving, estimated at 101 per square yard, and computing the price of these brick, found an additional overcharge of $11,355.86. He deducted these two items from the book figures and allowed for brick $232,174.39. Apparently after the draft had been made of his report, and before his report had been filed, he, on his own motion, re-opened the case for further testimony as to the number of brick. Complaint is made of his so doing, but his decision had not been rendered, and we have no doubt of his power, before filing his report, to permit the introduction of further evidence. The evidence so received was of certain persons who made an actual count of the brick at some sixty-seven different places within the paving districts. As a result of this, the referee made special findings that the pavement contained, in the top course, 66.55 bricks per square yard, and in the bottom course 41.45. He then revised his finding of the cost of the brick by adding $10,271.80 thereto. The district court on exceptions by Buckstaff set aside the finding as to the total number of brick used, and then found from the evidence that the cost of brick was not less than $246,576. The account was finally settled in accordance with that finding. As the case is presented

on the decree of the district court, which in this respect was founded on the evidence and not on the referee's findings, the question before us is not what we would find as the correct number of brick, or whether the number was correctly computed by the referee, but it is whether the court's finding of the total expense of the brick is sustained by the evidence. McDonald had at all times access to the books, and he availed himself of that privilege. The case so far is analogous to that of a partnership that the books are under such circumstances *prima facie* evidence on behalf of both parties. The books standing alone would sustain the court's finding as against any complaint McDonald might make. Both parties resorted to somewhat complicated processes of computation and reached widely divergent results. The basis of the court's computation does not appear in the decree. We have, however, pursued a method which seems as accurate as the state of the evidence and findings permits, and reach a result slightly in excess of the finding of the court, which will not therefore be disturbed. We shall not incumber the opinion with the detailed calculation, but shall content ourselves with indicating the method pursued. The total amount of brick paving was taken at 205,423.63 yards. (This from the finding of the referee, which accords with the evidence.) We accepted the referee's finding of the number of brick per square yard in the bottom and top courses respectively. Having thus obtained the total number of brick used, we deducted therefrom the number of brick furnished by parties other than the Vitrified Paving & Pressed Brick Company, as shown by the books. Of these a certain number are shown to have been used in the bottom course alone. The remainder were apportioned between the bottom and top courses, as indicated by the referee's finding of the number of brick per square yard in each. The contract between the Vitrified Paving & Pressed Brick Company and Stout & Buckstaff provided that top brick should lay not less than two inches by eight, or sixteen super-

ficial inches for each brick, and such brick were to be furnished at $10 per thousand, "but, for every superficial inch they will lay over the above size, we are to receive an additional compensation according to the increased superficial inches they will lay." The contract provided, as the means of determining the size of brick, that "as fast as each district is finished * * * it shall be inspected and sample bricks of the surface taken from several places in each block and street crossing and carefully measured, and ascertain the average superficial inches they have laid, to arrive at a basis of settlement and payment." The bottom brick was to be paid for at the rate of $10 per thousand, without provision for extra-sized brick. Having, in the manner indicated, ascertained the number of brick furnished by the brick company for each course, we added to the number found in the top course three-sixteenths thereto, the evidence showing that the top brick furnished measured two and three-eighths by eight inches, or nineteen square inches instead of sixteen. Each brick therefore should be counted as one and three-sixteenths. This method of computation decreased the allowance for extra size of brick which the referee took from the books, and which was manifestly miscalculated. Nevertheless when the just cost of brick so furnished by the brick company was thus ascertained, and to this item was added the actual cost of brick furnished by other parties, it was found that the court's estimate was a few dollars below the result reached by us.

The referee charged as expense against the work an item of $728.75 as loss suffered by the discounting of city warrants issued in payment of the work. This was upon the theory that the discounting of these warrants was within the ordinary financial operations of the business, and a matter entrusted to Buckstaff's discretion. This theory of the law was correct, but an examination of the books and the evidence discloses that a number of the warrants were discounted at a time when considerable

interest had accrued. The discount suffered was for the most part covered by this accrued interest, and the remainder was carried into the interest account where it figures in another item of the report. The excess over accrued interest was therefore charged twice, and that covered by the accrued interest should not have been charged unless the accrued interest was credited as a receipt. This item should therefore be stricken from the account.

There was much controversy on the hearing over certain items of expense of a suspicious, but unfortunately, perhaps, not of an uncommon, character in connection with such contracts. As to these expenditures Buckstaff testified, not very certainly, but sufficiently so to disclose their real character. In one place he stated: "It was to pay somebody to keep still and do as we wanted them to." In another: "It was for expense of administration; for service rendered by people whose names I do not care to state." And generally the testimony was that the expense was for "lobbying." From $5,000 to $5,500 of these expenses did not appear upon the books. The referee allowed it as a proper expense, on the theory that the contract was executed, and the parties should be left where they were. The court disallowed this item, but it allowed items of a kindred nature amounting to $1,820 which appeared on the books. We can see no reason for discriminating between the two classes of items. Buckstaff was the business manager and received all the money coming from the concern. He had charge of these operations and the burden devolved upon him of accounting for the expenditures. As to these items he is asking the assistance of the court to embrace them in the account as charges against McDonald. Every consideration of public policy demands that money paid out by a public contractor to induce men to keep still, to make them do as he wants them to, to lobby to secure him contracts, or to secure the allowance of estimates, should be considered as a corrupt and unlawful expenditure.

In such cases the court does not refuse to grant relief because the other party did not authorize the expenditure, nor does it grant relief because the other party did authorize it. It refuses to grant relief because the claim is corrupt in its nature and against public policy. The items entered on the books did not cease to be so tainted because they were so entered. If one member of a firm or organization engaged in public work expends his own funds in such a manner he cannot ask contribution from the others. If he has charge of the joint funds and is chargeable by the others therefor, he cannot discharge himself by showing that he so unlawfully spent the money. The item of $1,820 must be disallowed along with the $5,000.

An effort was made to show that the referee made an improper adjustment of what was called the "tool account." The tools used in the work were also used to a certain extent by Mason & McDonald, and by Buckstaff individually. They were finally sold in a damaged condition for a small sum. We are asked to readjust the apportionment made of the depreciation in the tools owing to their different uses. If the readjustment were made it could not very appreciably affect the account, and the condition of the item is such that no exact adjustment is possible. We do not feel we could improve on that made by the district court.

Correcting the judgment in accordance with the results here reached, we add to the expenses, $8,800, Buckstaff's salary, and deduct therefrom the items of discount of warrants, $728.75, and the various so-called lobbying expenses, $1,820. The net result of these corrections is the increase of expense account by $6,251.25, and decrease of profits accordingly. McDonald's fourth of the profits so ascertained is found to be $15,255.50, which other credits allowed by the referee and court increase to $15,-400.36. From this there should be deducted charges against McDonald, as found by the court, $12,898.57, and also the item of interest on the note above mentioned,

$17.70—in all $12,916.27—leaving on the face of the account a balance due McDonald from Buckstaff of $2,484.-09. From the judgment rendered in the district court Buckstaff was allowed to retain $625 for the payment of a claim in litigation. No complaint was made on this account and we continue the allowance. The result is that the judgment of the district court should be reversed, and judgment will be entered here similar thereto, except that the amount thereof will be $1,859.09, to which should be added interest at seven per cent from December 31, 1891, when the balance was taken.

DECREE ACCORDINGLY.

NORVAL, J., not sitting.